THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GUISEPPE D'ALESSANDRO, Respondent.

First Department, December 22, 1992

## APPEARANCES OF COUNSEL

*James M. McGuire* of counsel (*Hilary Hassler* and *Beth J. Thomas* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Salvatore S. Russo,* attorney, for respondent.

### OPINION OF THE COURT

MILONAS, J. P.

Defendant was found guilty, following a jury trial, of kidnapping in the first degree, coercion in the first degree, assault in the second degree, attempted robbery in the first degree and attempted grand larceny in the second degree. Defendant then moved for a mistrial or, alternatively, to set aside the verdict pursuant to CPL 330.30. Although the trial court denied a mistrial, it granted the motion to vacate the verdict and ordered a new trial. In a written opinion, the Judge concluded that while each impropriety allegedly committed by the Assistant District Attorney during summation might not, by itself, support setting aside the verdict, the cumulative effect of the errors deprived defendant of a fair trial. Thus, in the view of the court, vacatur was mandated on the basis of the prosecutorial misconduct that purportedly occurred in the course of her summation. This was error.

Defendant was charged with assaulting and handcuffing the complainant, Tamayo "Jaime" Abril, in the basement of a restaurant owned by defendant's father-in-law, Nino Garmelo, for supposedly stealing money from the business. In that regard, the 50-year-old complainant was employed at Nino's Gold King Restaurant, located on Thomas Street in Manhattan. At the time that Abril was first hired, Garmelo managed the establishment, but he eventually became ill so defendant assumed the operation of the business. In addition to Abril, there were five other employees, all of them Spanish-speaking. The complainant normally worked from 7:00 A.M. to 5:00 P.M., Monday through Friday, and, unlike those employees who were "up front" and waited on customers, he never, he testified, had access to the cash register.

On Monday, August 7, 1989, Abril returned to the restau-

rant after a 15-day vacation. At the end of his working day that Wednesday, defendant paid him for the last three days and stated that there would be no work for him until Monday. However, at approximately 6:15 A.M. the next morning, the complainant received a telephone call summoning him to the restaurant where defendant directed him to the kitchen near a doorway leading to the basement. Moments later, defendant entered, carrying a gun in one hand and a nightstick in the other. He accused Abril of stealing $3,000 on Tuesday. The complainant vainly attempted to point out that not only did he not work "in the front" but that defendant had paid him on Wednesday despite having discovered on Tuesday that money was missing. A customer named "Chi Chi", later identified as Frank Viggiano, stuck his head in to complain about the noise being caused by defendant's screaming at Abril.

Thereafter, defendant took the complainant down to the basement and continued to harangue and insult him, threatening to kill him and that Garmelo would commit reprisals. Impervious to pleas from Abril, defendant handcuffed him to an overhead boiler pipe and left him in the darkened area for more than 24 hours with his arm fully extended over his head. Defendant returned regularly throughout the day, reiterating his threats. Abril received neither food nor drink and was forced to relieve himself while still attached to the pipe. On one occasion, Garmelo came to the basement and told the complainant that if he did not return the $3,000, he would have to stay handcuffed for weeks and would never get out. Abril maintained his innocence of any theft. In the meantime, the complainant's family was subjected to menacing telephone calls throughout the day, and Abril's wife recognized defendant's voice. When the complainant's brother, wife and two daughters, all of whom took the stand except for one of the daughters, went to the restaurant in the morning, they were falsely informed that he had been taken away by the police, but their attempts to locate Abril through the police department or otherwise were unsuccessful. The harassing telephone calls persisted when the family returned home.

Although the complainant was finally uncuffed at about 6:30 A.M. on Friday, August 11th, he was still not released. Defendant continued to hurl accusations at him and warn of the administration of physical injuries, such as having his arms and feet broken. Abril's pleas to be released were unavailing, and he was locked in the basement for yet another

day. He was not brought upstairs until that evening, at which time defendant demanded that he call his wife and have her bring the money. Notwithstanding the complainant's insistence that they did not have any money, defendant dialed Abril's number and repeated his threats. At that point, the complainant declared that he was leaving and invited defendant to kill him from the back as he departed. The incarceration was promptly reported to the police. Moreover, Abril's injuries, caused by trauma and loss of circulation, which were, to some extent, present even during the trial, were demonstrated through medical records. In the course of the ensuing investigation, defendant, in response to the assertion by Detective Michael Castiglia that Abril had claimed that a gun was held to his head, stated that he had a license for the gun.

The defense urged that while the complainant was indeed summoned to the restaurant and charged with stealing, even screamed at by defendant, he was not taken to the basement, handcuffed and/or imprisoned. Rather, he voluntarily remained in the kitchen all day. According to the testimony of two brothers, both of whom had been at work in the restaurant on August 10th, Abril stood around in the kitchen. Neither they nor defendant's other witnesses ever saw a weapon. Two of the business's regular delivery men visited the restaurant's basement that same morning but did not notice anyone there. The defense also introduced a character witness who referred to defendant's "good reputation for prudence, honesty and peaceableness". In his summation, counsel stated that while each of the prosecution's witnesses was biased and not believable, the defense witnesses were disinterested and credible. The District Attorney, in turn, contended that many of the eyewitnesses had avoided observing incriminating evidence because they did not want to become involved in the matter. Of the more than 20 defense objections to the District Attorney's arguments, five were overruled and seven were sustained. Curative instructions were provided with respect to the remainder.

The basis for vacating a jury verdict prior to sentencing is strictly circumscribed by CPL 330.30 *(People v Carter,* 63 NY2d 530; *People v Carthrens,* 171 AD2d 387). In discussing this section, the Court of Appeals in *People v Carter (supra),* noted that "the power of a trial judge to set aside a guilty verdict is far more limited than the authority of an intermediate appellate court, which may determine not only questions of law but issues of fact and also may reverse a judgment as a

matter of discretion in the interest of justice when such is appropriate" *(People v Jones,* — AD2d —, —, 1992 NY Slip Op 5565 [1st Dept, Dec. 8, 1992]; *see also, People v Carthrens, supra).* As the Court of Appeals explained in *People v Carter (supra,* at 536), "[t]rial Judges have no such power. Nor are they authorized to set aside a verdict as against the weight of the evidence", in contrast to an intermediate appellate court, which is statutorily empowered to do so (CPL 470.15 [5]). Observed the Court therein, "[t]he power granted a Trial Judge by CPL 330.30 (subd 1) to set aside a verdict when reversal as a matter of law by an appellate court would be required is, as concerns proof of guilt, therefore normally limited to a determination that the trial evidence was not legally sufficient to establish the defendant's guilt of an offense of which he was convicted" *(People v Carter, supra,* at 536).

The trial court, consequently, would have been justified in granting vacatur only if reversal would have been mandated on appeal as a matter of law (CPL 330.30). In the situation herein, as the court appears to have acknowledged, the major portion of defendant's objections was unpreserved for appellate review. Most of the prosecutor's remarks complained of by the defense were followed by sustained objections or sustained objections accompanied by curative instructions. In that connection, defendant never protested the adequacy of the relief accorded by the Judge and neither objected to the curative instructions nor requested additional instructions *(People v Comer,* 73 NY2d 955, 957; *see also, People v Tardbania,* 72 NY2d 852, 853). His motion for a mistrial at the close of the People's summation, which he characterized as having been highly inflammatory and improper, was largely expressed in general terms. Where a defendant fails to raise in a timely manner a particular issue of law, such a claim is not preserved for appellate review and does not support reversal as a matter of law (CPL 470.05 [2]; *see, People v Bynum,* 70 NY2d 858; *People Balls,* 69 NY2d 641; *People v Nuccie,* 57 NY2d 818). However, even were the alleged improprieties deemed to have been preserved for appellate consideration, the District Attorney's summation certainly does not require reversal as a matter of law.

Isolated instances of prosecutorial misconduct on summation are insufficient to justify reversal in the absence of an "obdurate pattern of inflammatory remarks throughout the prosecutor's summation" *(People v Ortiz,* 116 AD2d 531, 532)

or unless the prosecutorial misconduct "is so pervasive, so egregious" and the "prosecutor's disregard of the court's rulings and warnings is * * * deliberate and reprehensible" *(People v Sandy,* 115 AD2d 27, 28). Notwithstanding that the sheer number of improprieties by the District Attorney may be a factor *(see, People v World,* 157 AD2d 567), the essential question is whether, upon consideration of the entire record, defendant has been deprived of his "fundamental right to a fair trial" *(People v Arce,* 42 NY2d 179, 191; *People v Jorge,* 171 AD2d 498, 499). It is axiomatic, however, that a prosecutor has a broad latitude available in summation, particularly in responding to the defense counsel's summation *(People v Galloway,* 54 NY2d 396; *People v Ortiz, supra).*

The District Attorney herein did on occasion exceed the bounds of legitimate fair comment as when, for example, she suggested that a witness might be exposing himself to danger by testifying *(see, People v McLeod,* 84 AD2d 794), appealed to the jurors' generalized fear of crime *(see, People v Young,* 113 AD2d 852, *lv denied* 66 NY2d 924) and their sympathies *(see, People v Ortiz, supra),* and vouched for the credibility of the People's witnesses *(see, People v Hicks,* 102 AD2d 173). Yet, the over-all effect of the prosecutor's summation was within the range of acceptability, and it cannot reasonably be found that she tried to depict defendant as a mobster who merited punishment for his general character and intimidation of witnesses rather than for the specific crimes with which he was charged. Indeed, to the extent that some of the District Attorney's statements overreached, these comments generally related to her conviction that the testimony favoring the defense was not worthy of belief, an approach that was understandable in view of the summation delivered by defendant's lawyer *(People v Galloway, supra; People v Aviles,* 176 AD2d 584), which impugned the credibility of the People's witnesses. In *People v Aviles (supra),* this Court asserted that "[a]s the defense summation vigorously and graphically sought to bring into question the reliability of the People's witnesses, the prosecutor's summation comments on credibility constituted an appropriate response * * * Otherwise, the prosecutor's summation constituted fair comment on the evidence. Presented within the broad bounds of rhetorical comment permissible in closing argument" *(supra,* at 585). As the Court of Appeals declared in *People v Morgan* (66 NY2d 255, 256), and which is equally pertinent herein: "When the * * * evidence in this case is viewed in a light most favorable to the

prosecution, as we are required to do on this appeal *(People v Kennedy,* 47 NY2d 196; *People v Benzinger,* 36 NY2d 29, 32), and the prosecution is given the benefit of every reasonable inference to be drawn therefrom *(People v Lewis,* 64 NY2d 1111, 1112; *People v Way,* 59 NY2d 361, 365; *People v Montanez,* 41 NY2d 53, 57), the facts from which the inference of defendant's guilt is drawn, when perceived as a whole, overwhelmingly establish his guilt beyond a reasonable doubt, are inconsistent with his innocence and exclude to a moral certainty ever other reasonable hypothesis *(see, People v Lewis, supra; People v Way, supra; People v Barnes,* 50 NY2d 375, 380; *People v Montanez, supra; People v Benzinger, supra).* Although the prosecutor's comments during summation went beyond the limits of propriety, in light of the overwhelming evidence of guilt, we hold that this error is harmless and that defendant was not deprived of a fair trial thereby *(see, People v Crimmins,* 36 NY2d 230; *People v Brosnan,* 32 NY2d 254; *People v Roopchand,* 65 NY2d 837)."

Since the proof of defendant's guilt was overwhelming, any prosecutorial misconduct was, under the circumstances, harmless error *(People v Villarino,* 184 AD2d 475), and his right to a fair trial was not abridged as a matter of law. Accordingly, the trial court was not warranted in granting the motion to vacate the conviction under CPL 330.30.

Therefore, the order of the Supreme Court, New York County (Jerome Hornblass, J.), entered on September 4, 1991, which granted defendant's motion to set aside a jury verdict convicting him of kidnapping in the first degree, coercion in the first degree, assault in the second degree, attempted robbery in the first degree and attempted grand larceny in the second degree, should be reversed on the law, the motion denied, the jury verdict reinstated and the matter remanded for sentencing.

ELLERIN, ROSS and ASCH, JJ., concur.

Order of the Supreme Court, New York County, entered on September 4, 1991, which granted defendant's motion to set aside a jury verdict convicting him of kidnapping in the first degree, coercion in the first degree, assault in the second degree, attempted robbery in the first degree and attempted grand larceny in the second degree, is reversed, on the law, the motion denied, the jury verdict reinstated and the matter remanded for sentencing.